**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **ROY CHAMBERS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:21-cv-002** |
| **WARDEN BROOKS BENTON, ET AL** | ) | |
| | ) | |
| **Defendants** | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR**
**RENEWED MOTION FOR SUMMARY JUDGMENT**

**I.    STATEMENT OF FACTS:**

**A.  Plaintiff's Allegations:**

The Plaintiff, former Coastal State Prison ("CSP") inmate Roy Chambers, Jr. ("Chambers"), alleges that at about 10:00 p.m. on April 17, 2020, he was housed in O Building, C Dormitory when a fire broke out in his dormitory.  The Plaintiff alleges that no fire alarm sounded and that no prison staff responded for over an hour before CSP Officer Mitchell came to evacuate the inmates from the dorm, during which time Chambers had to breathe in smoke.  (Dkt. No. 16, pg. 13).  Chambers claims that CSP Warden Benton and ADA Coordinator Mack were aware that the fire alarm was not working, that they ignored requests by the maintenance staff for work orders to repair the broken firm alarm system, and that prison understaffing contributed to the slow response to the fire. (Dkt. No. 18, pgs. 3-4).

Chambers claims that on the night of the fire, Defendant Mitchell failed to allow him to see a medical provider regarding his complaints of smoke inhalation and that CSP Medical Director Dr. Awe refused to treat him following the fire.  (Dkt. No. 16).  Chambers further alleges

that Defendants Benton and Mack failed to ensure that he received appropriate medical care for his injuries from the fire. (Dkt. No. 18, pg. 2).

### B. Defendants' Response to Plaintiff's Allegations:

On April 17, 2020, Chambers was housed at CSP in O Building, C dormitory, which is where inmates who needed ADA accommodations were housed. (Benton[1] Decl., ¶ 3). In April of 2020, O Building at CSP consisted of 4 open-style dormitories, named "A", "B", "C" and "D", in which inmates were housed and slept in an open room. Each of the four O Building dormitories has one "fire door" which opens up from the dormitory and into the prison yard. For security reasons, the "fire doors" remain locked and must be unlocked by a CSP security staff member in order to let inmates out of the dormitories and into the prison yard. (Benton Decl., ¶ 4; Mack[2] Decl., ¶ 4). In April 2020, each dormitory in O Building housed a maximum of 45-50 inmates, and it was extremely likely that one officer was assigned exclusively to O Building the night of April 17, 2020. (Benton Decl., ¶ 4).

In April of 2020, the fire alarm and fire sprinkler systems in O Building were not operational. (Benton Decl., ¶ 5). Prior to the fire of April 17, 2020, both Warden Benton and Ms. Mack were aware that efforts were underway to replace the fire alarm and sprinkler system in O Building, but neither Warden Benton nor Ms. Mack had the authority on their own to unilaterally

---

[1] From July 1, 2019 to December 31, 2021, Brooks Benton was the Warden of Coastal State Prison. (Benton Decl., ¶ 2).

[2] Ms. Mack was the Medical Unit Manager at CSP from March 1, 2018 to October 14, 2021. (Mack Decl., ¶ 2). As the Medical Unit Manager, Ms. Mack served as the liaison between the medical unit and the Warden's office, helped coordinate transportation for consults outside CSP and served as the ADA Coordinator at CSP. (Mack Decl., ¶ 2). As the ADA Coordinator, Ms. Mack was responsible for ensuring the ADA accommodations in O Building were made, but she did not oversee or manage routine security and non-ADA safety concerns (such as the fire alarm and sprinkler system) in O Building. (Mack Decl., ¶ 5). Ms. Mack did not participate in the day-to-day medical treatment of inmates. (Mack Decl., ¶ 6).

2

replace the fire alarm and sprinkler system in O Building. (Benton Decl., ¶ 5; Mack Decl., ¶ 5). Therefore, in order to ensure that inmates housed in O Building were safe from fire and smoke inhalation in April 2020, Warden Benton required (and Ms. Mack was aware that Warden Benton required) that correctional officers perform a "fire check" every thirty minutes, in which the correctional officer would make sure that there was no fire or smoke in the building. (Benton Decl., ¶ 5; Mack Decl., ¶ 5). Warden Benton also required (and Ms. Mack was aware that Warden Benton required) the officers to regularly perform a "fire door" check, in which the officers were required to ensure that the fire doors were secured and the pathway from each "fire door" to the yard was clear of any obstruction. (Benton Decl., ¶ 5; Mack Decl., ¶ 5).

On March 30, 2020, a monthly[3] Fire and Safety Inspection was performed for O Building, which shows that an evacuation plan was posted, the security officers and inmates were familiar with the evacuation plans, the telephone and radio systems in the control room were working, that a fire drill had been performed on March 30, 2020, that the exit lights and emergency lights were working, that the exit way was clear, that all the keys, locks and doors in O Building were working, and that the exits from O Building to the outside were clear and working. (Benton[4] Decl., ¶ 6; Benton Decl., Ex. "A"). The March 30, 2020 report further showed that the smoke detectors in O Building were not working but that the 30-minute fire watch was implemented to correct the deficiency, that the Fire Alarm System was out of order but that a project request had been submitted. (Benton Decl., ¶ 6; Benton Decl., Ex. "A").

---

[3] The March 30, 2020 Fire and Safety Inspection of O Building was the last Fire and Safety Inspection performed in O Building before the fire of April 17, 2020. (Benton Decl., ¶ 6; Benton Decl., Ex. "A").
[4] On March 30, 2020, Warden Benton reviewed and signed the March 30, 2020 Fire and Safety Inspection Form. (Benton Decl., ¶ 6; Benton Decl., Ex. "A").

Sometime between 8:30 p.m. and 9:00[5] p.m on April 17, 2020, Ms. Finch[6], who was the Duty Officer at CSP, was notified that a small fire had broken out in O Building, C dormitory and that smoke was in both C and D dormitories.  (Finch Decl., ¶ 3). Ms. Finch then called Warden Benton at his home and told him about the fire, and Warden Benton instructed Ms. Finch to evacuate the inmates housed C and D dormitories into the outdoor prison yard.  (Finch Decl., ¶ 3; Benton Decl., ¶ 9; Benton Decl., Ex. "C").  Inmates started the fire in the C dormitory trash can, and the fire was extinguished fairly quickly with a relatively small amount of smoke coming into the C and D dormitories.  (Finch Decl., ¶ 3).  Based upon Warden Benton's instructions, the Building Officer, the Officer-In-Charge and Ms. Finch began evacuating inmates from C and D dormitories out of the dormitories and into the prison yard, and it took them approximately 10-15 minutes to evacuate all of the inmates from C and D dormitories into the prison yard. (Finch Decl., ¶ 3).  In this case, the thirty-minute fire checks worked adequately to ensure that O Building did not catch on fire and that inmates were evacuated from the C and D dormitories safely and in a relatively short amount of time.  (Benton Decl., ¶ 9).

---

[5] The CSP officers recorded the findings of their Thirty Minute Fire checks into a 30-Minute Fire Watch Log.  (Benton Decl., ¶ 7; Benton Decl., Ex. "B"). The April 17, 2020 Second shift 30-Minute Fire Watch Log for O Building reflects that from approximately 2029 hours to 2035 hours (8:29 p.m. to 8:35 p.m.) on April 17, 2020, a fire occurred on C Range (meaning C Dormitory) and that there was smoke on C Range from 2100 hours to 2106 hours (9:00 p.m. to 9:06 pm). (Benton Decl., ¶ 7; Benton Decl., Ex. "B").  The O Building log book reflects that at 2240 hours (10:40 p.m.), an entry was made into the log book that reads "C range started a fire fire in the trashcan that smoked up both C and the D range.  Called Mrs. Finch she came down to the O building and found out that they were upset by the fact that they didn't have a phone to use for the last five days. Was informed by Warden to let both C and D ranges out to the yard to let the Range air out and called maintenance to check out the phone situation." (Benton Decl., ¶ 8; Benton Decl., Ex. "C").  For security reasons, CSP officers do not carry the O Building log book with at all times and will often make an entry into the log book after the occurrence of the relevant event; therefore, it would appear that the CSP officer who made the entry into the O Building log book at 10:40 p.m. on April 17, 2020 did so after the fire actually occurred.  (Benton Decl., ¶ 8; Benton Decl., Ex. "C").

[6] From mid-2017 to December 31, 2020, Ms. Finch was employed by the GDC as the SIP Coordinator at CSP. (Finch Decl., ¶ 2).

Once the inmates housed in C and D dormitories were in the prison yard, Ms. Finch stayed with the inmates in the yard while the CSP medical staff examined each and every inmate housed in C and D dormitory to ensure that they did not need further medical treatment that night. (Finch Decl., ¶ 4). Ms. Finch and the other CSP staff stayed in the prison yard for at least 45 minutes to ensure that all inmates had been examined by the CSP medical staff and that the smoke in O Building had been cleared from the building. (Finch Decl., ¶ 4). Ms. Mack was not present at CSP when the fire occurred in the evening of April 17, 2020. (Mack Decl., ¶ 5).

The O Building log book reflects that at 2120 hours (9:20 p.m.) on April 17, 2021, an officer Mitchell relieved Officer Akana of all duties in O Building. (Mitchell[7] Decl., ¶ 5). Though at times Michael Mitchell worked in the O Building in the evening, he did not work in O Building on the evening of April 17, 2020 because had Michael Mitchell worked in O Building on April 17, 2020, (1) he would have signed his name as "Sgt. Mitchell", not "OFC Mitchell" in the logbook (Mitchell, Decl. Ex. "A") and (2) the dorm officer signing the 30-Minute Fire Watch Log (Mitchell Decl., Ex. "B") signed it as "Herbert Mitchell", not Michael Mitchell. (Mitchell Decl., ¶ 6). Mr. Mitchell has never prevented Chambers from receiving medical care, either on April 17, 2020 or any other occasion. (Mitchell Decl., ¶ 7). Mr. Mitchell did not participate in the day-to-day medical treatment of inmates, and at no time following the April 17, 2020 fire did Mr. Mitchell ever have any reason to believe that Chambers was not receiving adequate medical treatment. (Mitchell Decl., ¶ 7).

---

[7] Michael Mitchell was employed by the GDC at CSP from August 2015 to 2022, with a short two month break in 2021. (Mitchell Decl., ¶ 2). In April of 2020, Michael Mitchell was the Security Threat Group Sergeant at CSP and monitored gang activity at the prison. (Mitchell Decl., ¶ 2).

On April 18, 2020, Chambers submitted a GDC Health Services Request Form (a "sick call slip"), in which he complained of having chest pain[8], trouble breathing, dizziness and blurred vision after inhaling smoke from a fire in his dorm the previous night (April 17, 2020). (Awe Decl., ¶ 9; Awe Decl., Ex. "F"). The fire in Chambers' dorm occurred late evening on Friday, April 17, 2020, and because Dr. Awe does not work at CSP on Saturdays and Sundays, Dr. Awe did not become aware of Chambers' medical complaints until Tuesday, April 21, 2020. (Awe Decl., ¶ 9). The April 18, 2020 Health Service Request Form shows that on Monday, April 20, 2020, a CSP medical staff member reviewed Chambers' April 18, 2020 Health Service Request Form and noted that an appointment had been scheduled for him to see the CSP medical staff. (Awe Decl., ¶ 9; Awe Decl., Ex. "F").

In April of 2020, CSP inmates were generally locked down in their dormitories due to the recent emergence of the COVID-19 coronavirus. (Awe Decl., ¶ 10; Benton Decl., ¶ 10; Mack Decl., ¶ 6). At that time, CSP nurses were checking each inmate's temperature and oxygen saturation rates on a daily basis to monitor the likelihood of inmates contracting COVID-19, and CSP nurses recorded their daily temperature and oxygen saturation rate[9] readings on a master sheet

---

[8] Prior to the fire of April 17, 2020, Chambers had experienced a history of heart problems. On January 22, 2020, Chambers was diagnosed with Syncope and a History of Myocardial Infarction. (Awe Decl., ¶ 4; Awe Decl, Ex. "A"). On February 11, 2020, Chambers underwent a Transthoracic Echocardiogram because he had a history of syncope and a Myocardial Infarction, and the Echocardiogram showed, among a findings, a left ventricular ejection fraction of 42.7% and grade I diastolic dysfunction in the left ventricle. (Awe Decl., ¶ 5; Awe Decl., Ex. "B"). On February 12, 2020, Chambers was diagnosed with Congestive Heart Failure status-post Echocardiogram. (Awe Decl., ¶ 6; Awe Decl., Ex. "C"). On April 9, 2020, after complaining of having a history of coughing, Chambers underwent a chest x-ray revealed which (1) "no evidence of acute cardiopulmonary disease seen" (2) "nonspecific 1.7 cm CC by 7.4 mm transverse parenchymal opacity in the peripheral right upper lobe; etiology indeterminate; DDX includes (but is not limited to) calcified lung nodule or granuloma." (Awe Decl., ¶ 8; Awe Decl., Ex. "E").

[9] An oxygen saturation rate measures the percentage of oxygen in the blood and is measured through a Pulse Oximeter, and a normal oxygen saturation rate is 95% or higher. (Awe Decl., ¶

for that dorm.  (Awe Decl., ¶ 10; Benton Decl., ¶ 10; Mack Decl., ¶ 6).  However, CSP inmates were allowed and did go to the CSP medical department if and when they needed medical care for chronic or urgent medical care.  (Benton Decl., ¶ 10; Mack Decl., ¶ 6).

After Dr. Awe reviewed Chambers sick call slip of April 18, 2020 on April 21, 2020, Dr. Awe checked Chambers' daily temperature and oxygen saturation rate recordings, which were normal and did not indicate that Chambers had suffered any breathing complications from the fire of April 17, 2020. (Awe Decl., ¶ 10).    Furthermore, in Dr. Awe's professional experience, if an inmate inhales smoke for a relatively short period of time (such as the 45 minutes claimed by Chambers in this lawsuit), the inmate may experience coughing and shortness of breath for a couple of days, but these are temporary symptoms that do not cause any long-lasting or permanent damage to the lungs or other parts of the body.   (Awe Decl., ¶ 10).  Therefore, on April 21, 2020, Dr. Awe believed that any shortness of breath, coughing or other symptoms Chambers may have incurred from the April 17, 2020 fire had resolved and Dr. Awe wrote on the April 18, 2020 Health Services Request Form that "[t]he symptoms should have resolved by now.  Your vitals (temp and oxygen) have all been normal range since 4/17/20 till date.  Your building is on lock down now and please follow-up prn" (meaning that Chambers could follow up for additional assistance if needed).  (Awe Decl., ¶ 10; Awe Decl. , Ex. "F").

On April 20, 2020, Ms. Mack saw Chambers in the CSP medical department, at which time he complained to Ms. Mack that he was having problems breathing as a result of inhaling smoke during the fire of April 17, 2020.  (Mack Decl., ¶ 7).  Ms. Mack then spoke with the CSP medical staff and was informed that each and every inmate in O Building C dormitory was examined by a CSP medical staff member in the CSP yard on April 17, 2020 after they had been evacuated from

---

10).   Persons with normal oxygen saturation rates typically do not experience shortness of breath when performing everyday activities. (Awe Decl., ¶ 10).

the dormitory. (Mack Decl., ¶ 7).   Ms. Mack then asked the CSP medical department to arrange for Chambers to be seen again by a CSP medical provider to examine him. (Mack Decl., ¶ 7). While Chambers made additional complaints to Ms. Mack in person and through the JPAY electronic system that he believed that he was not receiving appropriate medical care following the April 17, 2020 fire, at no time did Ms. Mack ever have believe or have any reason to believe that Chambers was not receiving adequate medical treatment following the fire of April 17, 2020. (Mack Decl., ¶ 7).   As the Warden of CSP, Warden Benton did not participate in the day-to-day medical treatment of inmates, and at no time following the April 17, 2020 fire did he ever have any reason to believe that Chambers was not receiving adequate medical treatment. (Benton Decl., ¶ 10).

At approximately 4:00 p.m. on April 21, 2020, Chambers was seen in the CSP medical department by NP William Agyemang, who recorded that Chambers complained of having pain in his left foot following a prior fracture of his left proximal tibia and fibula and treated Chambers for his complaints of left foot pain.  (Awe Decl., ¶ 11; Awe Decl., Ex. "G").   NP Agyemang did not note that Chambers was having any breathing difficulties and did not diagnose Chambers with any medical condition possibly related to the inhalation of smoke. (Awe Decl., ¶ 11; Awe Decl., Ex. "G").   On May 26, 2020, Chambers was seen by a CSP Registered Nurse after an orthopedic consult outside of CSP who noted that Chambers stated "I'm fine," had no signs of distress and a Respiration Rate of 18 breaths per minute, which was within the normal[10] range.  (Awe Decl., ¶ 12; Awe Decl., Ex. "H").

---

[10] A Respiration Rate within the normal range (12-20 breaths per minute for an adult) is an indication that a person is not experiencing shortness of breath or other breathing problems. (Awe Decl., ¶ 12; Awe Decl., Ex. "H").

On May 28, 2020, Chambers was seen by PA Hall, who noted that Chambers also had medical conditions of a seizure disorder, hypertension, DL (Dyslipidemia), Status-Post ORIF of the left fibia/tibula, and GERD.  (Awe Decl., ¶ 13; Awe Decl., Ex. "I").  PA Hall noted that Chambers had a Respiration Rate of 18 and an Oxygen Saturation Rage (as measured by the Pulse Oximeter) of 99%, both of which were normal and which indicate that Chambers had no problems breathing at that time. (Awe Decl., ¶ 13; Awe Decl., Ex. "I").  PA Hall did not note that Chambers had any difficulty breathing and diagnosed him with ORIF, seizure disorder, hypertension, DL, and GERD.  (Awe Decl., ¶ 13; Awe Decl., Ex. "I").

On June 1, 2020, Dr. Awe renewed Chambers' pain medications of Naproxen and Robaxin, and on June 22, 2020, Dr. Awe renewed Chambers' profile for a low bunk/crutches profile. (Awe Decl., ¶ 14; Awe Decl., Ex. "J").  On June 23, 2020, Chambers was seen by a CSP RN, who noted that Chambers told her "I'm alright," had no signs of distress and a Respiration Rate of 18.  (Awe Decl., ¶ 15; Awe Decl., Ex. "K").

On June 25, 2020, Chambers was seen in the CSP medical department by PA Hall as a six-month follow-up of his chronic medical conditions.  (Awe Decl., ¶ 16; Awe Decl., Ex. "L").  PA Hall noted that Chambers complained regarding an orthopedic consult but checked that Chambers had no complaints of any symptoms, including no complaints of dyspnea, cough, dizziness, or wheezing, determined that Chambers had a Respiration Rate of 18 and did not find that Chambers had any breathing difficulties.  (Awe Decl., ¶ 16; Awe Decl., Ex. "L").  PA Hall also noted that that Chambers was "WNL", meaning "Within Normal Limits," for his General Appearance, HEENT (meaning Head, Ears, Eyes, Nose and Throat), Neck, Breast, Heart, Lungs, Abdomen, and among other areas.  (Awe Decl., ¶ 16; Awe Decl., Ex. "L").

On July 27, 2020, Chambers was seen by PA Hall, who recorded that Chambers did not trust an orthopedic provider to perform a procedure on him, that he had concerns about his health

and that he wanted to speak with Dr. Awe, the CSP Medical Director, regarding a previous decision that he no longer needed a wheelchair.  (Awe Decl., ¶ 17; Awe Decl., Ex. "M").  On August 13, 2020, Chambers was seen by PA Hall, who recorded that Chambers did not want to see orthopedic Dr. Winchell regarding an orthopedic procedure and that he wanted to speak with Dr. Awe, the CSP Medical Director, regarding his options. (Awe Decl., ¶ 18; Awe Decl., Ex. "N").

On August 17, 2020, Dr. Awe saw Chambers as follow up of multiple medical conditions. (Awe Decl., ¶ 19; Awe Decl., Ex. "O").  Chambers told Dr. Awe that he had pain "all over the body;" however, Chambers did not tell Dr. Awe[11] on August 17, 2020 that he was suffering any symptoms that could possibly be related to smoke inhalation, such as shortness of breath.  (Awe Decl., ¶ 19; Awe Decl., Ex. "O").  Dr. Awe noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 99%, which indicated that Chambers had no problems breathing at that time, and his chest was clear and that his cardiovascular system was normal. (Awe Decl., ¶ 19; Awe Decl., Ex. "O").  After examining Chambers, Dr. Awe noted that he was very argumentative, would not leave his office and did not want orthopedic Dr. Wenchell to perform surgery on him. (Awe Decl., ¶ 19; Awe Decl., Ex. "O").  Dr. Awe also noted on August 17, 2020 that an EKG was normal, which indicates that an EKG was performed on Chambers on or around August 17, 2020 in the CSP medical department and that its findings were normal. (Awe Decl., ¶ 19; Awe Decl., Ex. "O").   Dr. Awe diagnosed Chambers with "multiarea pain, numbness in extremities and exaggerated symptoms" which were inconsistent with "objective evidence."  (Awe Decl., ¶ 19; Awe Decl., Ex. "O").

---

[11] Had Chambers informed Dr. Awe on August 17, 2020 that he was suffering from symptoms potentially related to smoke inhalation, Dr. Awe would have noted those complaints in the Medical Encounter Form of August 17, 2020.  (Awe Decl., ¶ 19; Awe Decl., Ex. "O").

On September 11, 2020, Chambers was in the CSP medical department by NP Agyemang, who noted that Chambers was complaining about his leg pain and wanted to see Dr. Awe to discuss his medical problems.  (Awe Decl., ¶ 20; Awe Decl., Ex. "P").  NP Agyemang noted that Chambers was "unable to articulate any real need." (Awe Decl., ¶ 20; Awe Decl., Ex. "P").

On September 16, 2020, Dr. Awe saw Chambers in the CSP medical department, and Chambers stated that he wanted his seizure medication increased, that he needed surgery on his toes and that he needed his wheelchair. (Awe Decl., ¶ 21; Awe Decl., Ex. "Q").   Chambers did not tell Dr. Awe[12] on September 16, 2020 that he was suffering any symptoms that could possibly be related to smoke inhalation, such as shortness of breath.  (Awe Decl., ¶ 21; Awe Decl., Ex. "Q").  Chambers had a Respiration Rate of 18, was not in any acute distress, had a clear chest and normal cardiovascular system.    (Awe Decl., ¶ 21; Awe Decl., Ex. "Q").   Dr. Awe diagnosed Chambers with multiple chronic joint pain and a history of increased cholesterol, hypertension, and a seizure disorder. (Awe Decl., ¶ 21; Awe Decl., Ex. "Q").

On September 28, 2020, Chambers was seen in the CSP medical department by an LPN who recorded that Chambers told her "I'm okay" and then noted that Chambers was in no acute distress and had a Respiration Rate of 18.  (Awe Decl., ¶ 22; Awe Decl., Ex. "R").   On September 28, 2020, Chambers signed a COVID-19 Form attesting that "I do not have a respiratory illness (cough, shortness of breath, fever)." (Awe Decl., ¶ 23; Awe Decl., Ex. "S").

On October 1, 2020, Chambers was seen in the CSP medical department following an outside pain management consult by NP Agyemang, who noted that Chambers had a Respiration Rate of 18, that his lungs were "CTAB" (which stands for "Clear to Auscultation Bilaterally",

---

[12] Had Chambers informed Dr. Awe on September 16, 2020 that he was suffering from symptoms potentially related to smoke inhalation, Dr. Awe would have noted those complaints in the Medical Encounter Form of September 16, 2020.  (Awe Decl., ¶ 21; Awe Decl., Ex. "Q").

meaning that they were clear) and then diagnosed Chambers with Chronic Pain Syndrome.  (Awe Decl., ¶ 24; Awe Decl., Ex. "T").

On October 26, 2020, Chambers was seen in the CSP medical department as a follow up for an outside orthopedic consult by PA Hall, who noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 100%, that his Cardiovascular assessment was "RRR" (mearing regular rate and rhythm) with no "MRG" (meaning murmurs, rubs or gallops), and that his respiratory was Clear to Auscultation Bilaterally with no wheezing.  (Awe Decl., ¶ 25; Awe Decl., Ex. "U").   PA Hall diagnosed Chambers with a history of left knee pain, chronic back and neck pain and a hallus valgus. (Awe Decl., ¶ 25; Awe Decl., Ex. "U").

On November 17, 2020, Chambers was seen in the CSP medical department by NP Agyemang, who noted that Chambers wanted a renewal of his Naproxen prescription and had a history of headaches and Degenerative Joint Disease.  (Awe Decl., ¶ 26; Awe Decl., Ex. "V").  NP Agyemang noted that his Respiration Rate was 18, his Oxygen Saturation Rate was 99%, that his lungs were Clear to Auscultation Bilaterally and that his heart had "RRR" and normal S1 and S2 sounds. (Awe Decl., ¶ 26; Awe Decl., Ex. "V").    NP Agyemang diagnosed Chambers with Headaches and DDD/DJD. (Awe Decl., ¶ 26; Awe Decl., Ex. "V").   On November 24, 2020, Chambers was seen in the CSP medical department by a CSP medical provider who recorded that Chambers stated "I'm okay" and then noted that Chambers was in no acute distress and had a Respiration Rate of 18.  (Awe Decl., ¶ 27; Awe Decl., Ex. "W").

On November 30, 2020, Chambers was seen in the CSP medical department by NP Agyemang and complained regarding his hallux valgus of his left foot; NP Agyemang noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 98%, that his lungs were Clear to Auscultation Bilaterally and that his heart was "RRR" his normal S1 and S2 sounds. (Awe

Decl., ¶ 28; Awe Decl., Ex. "X").    NP Agymang diagnosed Chambers with Allergic Rhinitis and Bunions on his left foot. (Awe Decl., ¶ 28; Awe Decl., Ex. "X").

On January 5, 2021, Chambers was seen in the CSP medical department by Dr. Doris Cifuentes, who noted that Chambers complained of "pain in chest since 4/17/2020 when pt states he was injured due to fire in his dorm-Pt stated that he inhaled smoke for 45 minutes. Pt however received medical evaluation at the time and was told was he fine. Pt states that he feels that his CP is due to that incident." (Awe Decl., ¶ 29; Awe Decl., Ex. "Y"). Dr. Cifuentes also noted that Chambers also complained of having chest pain and shortness of breath, fatigue, cough and unable to sleep because he was exposed to second-hand smoke in his dorm. (Awe Decl., ¶ 29; Awe Decl., Ex. "Y"). Dr. Cifuentes noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 98%, that his lungs were Clear to Auscultation Bilaterally and that his heart was "RRR" with normal S1 and S2 sounds. (Awe Decl., ¶ 29; Awe Decl., Ex. "Y"). Chambers institutional medical records show that January 5, 2021 is the first time that Chambers directly complained to a medical provider in the CSP medical department regarding any problems he may have incurred from the April 17, 2020 dorm fire since his sick call slip of April 18, 2020. (Awe Decl., ¶ 29).

On January 7, 2021, Chambers underwent an x-ray of his chest, which showed "[t]he cardiac silhouette measures within normal limits. The hilar and mediastinal structures appear unremarkable. The lungs are clear. The osseous structures appear grossly intact. No evidence of acute cardiopulmonary disease, communicable disease or tuberculosis." (Awe Decl., ¶ 30; Awe Decl., Ex. "Z").

On January 19, 2021, Dr. Awe saw Chambers in the CSP medical department as a follow from his cardiology telemed consult and noted that Chambers had a Respiration Rate of 17, an Oxygen Saturation Rate of 99% and that he was unremarkable and unchanged from his previous findings. (Awe Decl., ¶ 31; Awe Decl., Ex. "AA"). Dr. Awe diagnosed Chambers with a history

of syncope and unexplained dizziness and noted that Cardiology recommended that Chambers undergo another Echocardiogram. (Awe Decl., ¶ 31; Awe Decl., Ex. "AA"). Chambers did not tell Dr. Awe[13] on January 19, 2021 that he was suffering any symptoms that could possibly be related to smoke inhalation, such as shortness of breath. (Awe Decl., ¶ 31; Awe Decl., Ex. "AA"). Therefore, on January 19, 2021, Dr. Awe wrote a consult for Chambers to undergo another Echocardiogram. (Awe Decl., ¶ 31; Awe Decl., Exs. "AA", "BB" and "CC").

On February 12, 2021, Chambers was seen in the CSP medical department by PA Hall, who noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 97%, that his chest was normal, his lungs were Clear to Auscultation Bilaterally, and his heart was "RRR" with no "MRG." (Awe Decl., ¶ 32; Awe Decl., Ex. "DD"). PA Hall noted that Chambers' cardiovascular disease was stable and under good control. (Awe Decl., ¶ 32; Awe Decl., Ex. "DD"). On April 12, 2021, Chambers was seen in the CSP medical department by NP Agyemang, who saw Chambers as a follow-up visit after an orthopedic consult and noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 97%, that his lungs were Clear to Auscultation Bilaterally with no shortness of breath and no activity intolerance and that his heart was "RRR" with normal S1 and S2 sounds. (Awe Decl., ¶ 33; Awe Decl., Ex. "EE"). NP Agyemang diagnosed Chambers with history of DDD with radiculopathy. (Awe Decl., ¶ 33; Awe Decl., Ex. "EE").

On May 5, 2021, Chambers was seen in the CSP medical department by PA Hall and requested that he be permitted to ride in a special wheelchair van to medical appointments. (Awe Decl., ¶ 34; Awe Decl., Ex. "FF"). PA Hall noted that Chambers' Respiration Rate was 18, his

---

[13] Had Chambers informed Dr. Awe on January 19, 2021 that he was suffering from symptoms potentially related to smoke inhalation, Dr. Awe would have noted those complaints in the Medical Encounter Form of January 19, 2021. (Awe Decl., ¶ 31; Awe Decl., Ex. "AA").

Oxygen Saturation Rate was 97%, his chest had normal chest expansion, his lungs were Clear to Auscultation Bilaterally with no wheezing and that his heart was "RRR" with no "MRG". (Awe Decl., ¶ 34; Awe Decl., Ex. "FF").     PA Hall also noted that Chambers' cardiovascular disease with stable and under good control. (Awe Decl., ¶ 34; Awe Decl., Ex. "FF").    Chambers' subsequent medical exams at CSP showed that his lungs and breathing were normal[14].

Based upon Dr. Awe's personal treatment of Chambers and his review of his GDC medical records, Dr. Awe does not see any evidence that Chambers suffered any long term injury as a result of April 17, 2020 smoke inhalation.    (Awe Decl., ¶ 38). In this case, Chambers' recorded Respiration Rates, Oxygen Saturation Rates, and lung exams, as well as his chest x-rays, were entirely normal from April 2020 until his release from GDC custody in May of 2022, and this objective evidence shows that Chambers did not have any shortness of breath during his medical exams after the April 17, 2020 fire. (Awe Decl., ¶ 38).  In addition, prior to the April 2020 fire, Chambers had a history of Myocardial Infarction and was treated for his complaints of unexplained

---

[14] On May 13, 2021, Chambers was seen in the CSP medical department as a follow up of his orthopedic issues by PA Hall, who noted that his Respiration Rate was 18, his Oxygen Saturation Rate was 97%, that his exam was unchanged from his previous visit and diagnosed him with DDD with radiculopathy. (Awe Decl., ¶ 35; Awe Decl., Ex. "GG").  On February 7, 2022, Chambers was seen in the CSP medical department by NP Agyemang, who noted that Chambers' Respiration Rate was 18, that his chest had normal expansion, his lungs were Clear to Auscultation Bilaterally, and his heart was "RRR" with normal S1 and S2 sounds.  (Awe Decl., ¶ 36; Awe Decl., Ex. "HH"). NP Agyemang also noted that Chambers' cardiovascular disease with stable and under good control.  (Awe Decl., ¶ 36; Awe Decl., Ex. "HH").    On March 12, 2022, Chambers was seen in the CSP medical department by NP Agyemang, who saw Chambers as a follow up after a cardiology consult, which occurred due to Chambers' unexplained syncopal episodes. (Awe Decl., ¶ 37; Awe Decl., Ex. "II").   NP Agyemang noted that Chambers had a Respiration Rate of 18, an Oxygen Saturation Rate of 97%, that his lungs were Clear to Auscultation Bilaterally and that his Heart was "RRR" with normal S1 and S2 sounds.  (Awe Decl., ¶ 37; Awe Decl., Ex. "II").    NP Agyemang diagnosed Chambers with a history of unexplained recurrent syncopal episodes and noted that Chambers had previously refused a prior echocardiogram. (Awe Decl., ¶ 37; Awe Decl., Ex. "II").

syncope, and therefore any chest pain and unexplained syncope did not result from smoke inhalation in April 2020.  (Awe Decl., ¶ 38).

After Dr. Awe signed off on the April 18, 2020 sick call slip stating that Chambers' shortness of breath and dizziness and blurred vision should have resolved based upon his professional experience and his temperature and oxygen saturation rate readings, Dr. Awe was not aware that Chambers may have believed that he was still suffering symptoms from the April 2020 smoke inhalation until he received a copy of this lawsuit sometime in 2022.   (Awe Decl., ¶ 39).

## II. ARGUMENT AND CITATION OF AUTHORITY:

### A. Summary Judgment Standard:

Summary judgment is appropriate "when the evidence before the court demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002) (quoting Fed. R. Civ. P. 56(c)).  The court construes the evidence "in the light most favorable to the non-moving party." *See* id.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 550 U.S. 372, 380 (2007).  When reviewing the record, the trial court need not accept or give credit to the plaintiff's conclusory allegations that are not supported by physical evidence, medical records or corroborating witness testimony.  *See, e.g.,* Bennett v. Parker, 898 F.2d 1530, 1533-34 (11th Cir. 1990) (discounting inmate's allegations of force and resulting injuries that were not supported by his medical record); *accord* Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987).

### B. The Plaintiff is not entitled to Compensatory damages:

Section 1997e(e) of Title 42 (the "PLRA") clearly mandates that "no Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  Courts in

the Eleventh Circuit[15] have found injuries such as scrapes and bruises are *de minimis* injuries and prohibit a plaintiff from recovering compensatory damages.

Chambers did not suffer any long-term breathing issues, lung injuries or develop any disease as a result of the fire of April 17, 2020. (Awe Decl., ¶ 38). Chambers' recorded Respiration Rates, Oxygen Saturation Rates, and lung exams, as well as his chest x-rays, were entirely normal from April 2020 until his release from GDC custody in May of 2022, which indicates that Chambers did not have any breathing difficulty during his medical exams after the April 17, 2020 fire. (Awe Decl., ¶ 38). In addition, prior to the April 2020 fire, Chambers had a history of Myocardial Infarction and was treated for his complaints of unexplained syncope, and therefore any chest pain and unexplained syncope did not result from smoke inhalation in April 2020. (Awe Decl., ¶ 38). In sum, the Plaintiff cannot show that he suffered any physical injury and is therefore not entitled to recover compensatory damages.

**C. Plaintiff's Deliberate Indifference Fire Safety Claim Fails:**

Wade v. McDade, 2024 U.S. App. LEXIS 16880 (11th Cir. July 10, 2024) is an Eighth Amendment case concerning the provision of medical care to a state prisoner. The Court had taken the matter *en banc* to answer this question: "What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?" 2024 U.S. App. LEXIS 16880, *3. At the

---

[15] See Al-Amin v. Smith, 637 F.3d 1992, 1999 (11th Cir. 2011); Thompson v. Sec'y, Fla. Dep't of Corr., 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (describing an approach of asking whether the injury would require a free world person to visit an emergency room or doctor) (citing Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997) ("A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which lasts even up to two or three weeks.")); Quilan v. Personal Trans. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009)(holding an inmate's alleged temporary chest pain, headache and difficulty breathing were *de minimis* injuries). While all the cases cited herein hold that an inmate-plaintiff cannot recover compensatory or punitive damages without a showing of physical injury, the Eleventh Circuit held in Hoever v. Marks, 993 F.3d 1353 (11th Cir. 2021) that 42 U.S.C. 1997e(e) bars an inmate from recovering compensatory damages but not punitive damages absent a showing of physical injury.

outset of its decision, the Court candidly recognizes that, "[f]or decades, our own precedent has been marred by internal inconsistency regarding the showing that a prison inmate must make to demonstrate that prison officials were deliberately indifferent in violation of the Eighth Amendment." Id., *8. The Court said further that its "precedent reflects a persistent split between cases holding that the inmate must prove that the official's conduct reflected 'more than mere negligence' and those holding that the inmate must demonstrate that the official acted with 'more than gross negligence.'" Id., *8-9. Wade rejected both of those prior formulations and adopted this new test:

First, the plaintiff must demonstrate that he suffered an "objectively, sufficiently serious" deprivation. Id., *25-26 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Second, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law." Id. (quoting Farmer, 511 U.S. at 839). This second prong requires that the plaintiff show that the defendant was actually subjectively aware that *his own conduct* caused a substantial risk of serious harm to the plaintiff. Id. The focus is to be placed not on a preexisting risk but instead on risk that is inextricably tied to the defendant's own conduct. Id., *16-18. An official's failure to relieve a serious risk that he "should have perceived, but did not" remains outside the scope of deliberate indifference. Id., *12 (quoting Farmer, 511 U.S. at 838). Finally, the defendant cannot be held liable if he "responded reasonably to the risk." Id., *13, 26 (quoting Farmer, 511 U.S. at 844-45). In regards to his deliberate indifference to safety claim, the Plaintiff cannot meet the subjective component and establish that any of these Defendants acted with deliberate difference under the standards set forth in Wade.

In this case, Defendants Benton and Mack knew that fire alarm and sprinkler system in O Building were not functioning on April 17, 2020; however, the remedial actions that Benton took

(and Mack was aware that he took) demonstrate that they did not act with "subjective recklessness as used in criminal law" and that they responded reasonably to the risk of fire.

For instance, Warden Benton and Ms. Mack were aware that efforts were underway to replace the fire alarm and sprinkler system. (Benton Decl., ¶ 5; Mack Decl., ¶ 5). Warden Benton required that correctional officers perform a "fire check" every thirty minutes, in which the correctional officer would make sure that there was no fire or smoke in the building, and required the officers to regularly perform a "fire door" check, in which the officers ensured that the fire doors were secured and the pathway from each "fire door" to the yard was clear of any obstruction, and Ms. Mack knew of these requirements. (Benton Decl., ¶ 5; Mack Decl., ¶ 5).

The monthly Fire and Safety Inspection performed for O Building on March 30, 2020 included a fire drill and shows that numerous safety measures had been implemented in O Building to protect inmates from fire. For instance, an evacuation plan was posted, the security officers and inmates were familiar with the evacuation plans, the telephone and radio systems in the control room were working, the exit lights and emergency lights were working, the exit way was clear, all the keys, locks and doors in O Building were working, the exits from O Building to the outside were clear and working, the 30-minute fire watch was implemented, and a project request had been submitted to replace the fire alarm system. (Benton Decl., ¶ 6; Benton Decl., Ex. "A").

Furthermore, the safety measures which had been implemented prior to April 17, 2020 helped ensure that inmates were evacuated from O-Building in a safe and expedited manner on the night of the fire[16]. An Officer Mitchell noted in the April 17, 2020 Second Shift 30-Minute Fire Watch Log for O Building that from approximately 2029 hours to 2035 hours (8:29 p.m. to 8:35

---

[16] The fire of April 17, 2020 was a small one that started in a trash can and then smoked up the C and D range in O Building. (Benton Decl., ¶ 8; Benton Decl., Ex. "C"). The Plaintiff does not allege that the O Building caught on fire, nor is there any evidence that it did.

p.m.) on April 17, 2020, a fire occurred on C Range (meaning C Dormitory) and that there was smoke on C Range from 2100 hours to 2106 hours (9:00 p.m. to 9:06 pm). (Benton Decl., ¶ 7; Benton Decl., Ex. "B").   Between 8:30 pm and 9:00 pm on April 17, 2020, Duty Officer Finch called Warden Benton, who instructed her to evacuate the inmates from C and D dormitories in the prison yard.  (Benton Decl., ¶ 9; Benton Decl., Ex. "C").  Thereafter, the Building Officer, the Officer-In-Charge and Ms. Finch[17] took 10-15 minutes to evacuate all the C and D Dormitory inmates to prison yard, where they were checked by the CSP medical staff to ensure that they did not need any additional treatment that night. (Finch Decl., ¶ 3, 4).

In sum, Warden Benton and Ms. Mack took all reasonable precautions to minimize fire risks in a building that did not have a working fire alarm and sprinkler system, and their advanced planning helped to ensure that inmates in O Building were evacuated quickly and seen by the medical staff that evening.  The Plaintiff cannot demonstrate that Defendants Benton and Wade acted with subjective recklessness as defined in Wade, and therefore they are entitled to summary judgment on this claim.

**D.  The Plaintiff's Deliberate Indifference to Medical Needs Claim Fails:**

The Plaintiff's deliberate indifference to serious medical needs also fails under the standards set forth in Wade. First, the Plaintiff cannot demonstrate that he had a "serious medical need."  In Boyce v. Johnson, 2015 WL 7351679, * 8 (N.D. Ill. Nov. 20, 2015), the Court noted "mild smoke inhalation is generally not held to be a serious medical need."  Though Chambers alleges that he suffered breathing issues and other medical problems as a result of the smoke

---

[17] Though the Plaintiff alleges that understaffing at CSP led to a slow response time to the fire, Chambers cannot produce any evidence to substantiate these allegations.  In contrast, the Defendants have shown that three CSP staff members helped evacuate the inmates in O Building, C Dormitory (which housed a maximum of 45-50 inmates) shortly after the CSP prison administration became aware of fire. (Finch Decl., ¶ 3; Benton Decl., ¶ 4).

inhalation, Chambers did not complain to any CSP medical provider of any breathing difficulties that may have resulted from the fire until January 5, 2021 (Awe Decl., ¶ 29; Awe Decl., Ex. "Y"), and all of the objective findings related to his breathing, lungs and chest after the fire were normal. (Awe Decl).

Second, the Plaintiff cannot demonstrate that any of the four defendants acted with deliberate indifference.   On April 21, 2020, Dr. Awe reasonably evaluated the Plaintiff's complaints in his April 18, 2020 sick slip by checking Chambers' daily temperature and oxygen saturation rate recordings, which were normal and did not indicate that Chambers had suffered any breathing complications from the fire of April 17, 2020. (Awe Decl., ¶ 10).   In addition, Dr. Awe knew that an inmate inhaling smoke for a relatively short period of time may experience coughing and shortness of breath for several days but these temporary symptoms that do not cause any long-lasting or permanent damage to the lungs or other parts of the body.   (Awe Decl., ¶ 10).  Therefore, on April 21, 2020, Dr. Awe believed that any shortness of breath, coughing or other symptoms Chambers may have incurred from the April 17, 2020 fire had resolved and wrote for Chambers to follow up as needed. (Awe Decl., ¶ 10; Awe Decl. , Ex. "F").

Furthermore, Chambers was seen at approximately 4:00 p.m. on April 21, 2020 by NP Agyemang, who noted Chambers complained of having pain in his left foot but did not find that Chambers was having any breathing difficulties and did not diagnose Chambers with any medical condition possibly related to the inhalation of smoke. (Awe Decl., ¶ 11; Awe Decl., Ex. "G").   In sum, the Plaintiff's medical history from April 17, 2020 to his release shows Dr. Awe (and the other CSP medical providers) gave the Plaintiff appropriate medical treatment for the conditions of which he complained after the fire.  The Plaintiff disagrees with Dr. Awe's treatment of April 21, 2020, but the Eleventh Circuit has consistently held that "a simple difference in medical opinion" does not constitute deliberate indifference.  Waldrop v. Evans, 871 F. 2d 1030, 1033 (11th

Cir. 1989). *See also* <u>Bingham v. Thomas</u>, 654 F. 3d 1171, 1176 (11th Cir. 2011)(negligence as to

a diagnosis or treatment, or even medical malpractice, does not constitute deliberate indifference.).

For these reasons, Dr. Awe is entitled to summary judgment.

As to the Plaintiff's medical claims against Benton, Mack and Mitchell, "[a] medical

treatment claim will not lie against non-medical personnel unless they were personally involved

in the denial of treatment or deliberately interfered with prison doctors' treatment. Prison officials

are entitled to rely on the opinions, judgment and expertise of a prison medical staff to determine

a medically necessary and appropriate cause of treatment for an inmate." <u>Williams v. Limestone

Cty., Ala.</u>, 198 F. App'x 893, 897 (11th Cir. 2006)). See also <u>Kelly v. Ambroski</u>, 97 F.Supp. 3d

1320, 1343 (N.D. Ala. 2015) ("[I]n the absence of a reason to believe, or actual knowledge, that

medical staff is administering inadequate medical care, non-medical prison personnel are not

chargeable with the Eighth Amendment scienter requirement of deliberate indifference[.]")).

After Chambers complained to Ms. Mack on April 20, 2020 that he was having problems

breathing as a result of inhaling smoke during the fire of April 17, 2020, Ms. Mack then spoke

with the CSP medical staff and was informed that each and every inmate in O Building C dormitory

was examined by a CSP medical staff member in the CSP yard on April 17, 2020 after they had

been evacuated from the dormitory, and then Ms. Mack asked the CSP medical department to

arrange for Chambers to be seen again by a CSP medical provider to examine him. (Mack Decl.,

¶ 7). While Chambers made additional complaints to Ms. Mack in person and through the JPAY

electronic system that he believed that he was not receiving appropriate medical care following

the April 17, 2020 fire, at no time did Ms. Mack ever have believe or have any reason to believe

that Chambers was not receiving adequate medical treatment following the fire of April 17, 2020.

(Mack Decl., ¶ 7).    Likewise, as the Warden of CSP, Warden Benton did not participate in the

day-to-day medical treatment of inmates, and at no time following the April 17, 2020 fire did he

ever have any reason to believe that Chambers was not receiving adequate medical treatment. (Benton Decl., ¶ 10).

Defendant Michael Mitchell was not present in O Building the night of April 17, 2020. (Mitchell Decl., ¶ 5, 6; Mitchell Decl., Exs. "A" and "B").  Mr. Michael Mitchell has never prevented Chambers from receiving medical care, either on April 17, 2020 or any other occasion. (Mitchell Decl., ¶ 7).  Mr. Michael Mitchell did not participate in the day-to-day medical treatment of inmates, and at no time following the April 17, 2020 fire did Mr. Michael Mitchell ever have any reason to believe that Chambers was not receiving adequate medical treatment. (Mitchell Decl., ¶ 7).

Third, even if Chambers can show that he had a serious medical need and that the defendants acted with subjective recklessness as defined in <u>Wade</u>, he cannot prove that their deliberate indifference caused or exacerbated his injuries.  See <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010) (noting that a plaintiff must "show a causal connection between the constitutional violation and his injuries" to prevail on any Section 1983 claim).  For the reasons set forth above, the Plaintiff's deliberate indifference to serious medical needs claim must fail.

**E.  <u>The Defendants are Entitled to Qualified Immunity</u>:**

The Defendants are entitled to qualified immunity as "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 (1998) (citation omitted). The test for qualified immunity is two pronged: (1) was the government official acting within the scope of his discretionary authority; and (2) did the official's conduct violate "clearly established law."  <u>Maggio v. Sipple</u>, 211 F. 3d 1346, 1350 (11th Cir. 2000).

In determining whether a governmental employee was acting within his discretionary authority, the question is whether he was performing a legitimate job-related function through means that were within his power to utilize. See Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). The Defendants were acting at all relevant times within their duties as state employees, and there is no allegation or evidence that at any time they acted outside of those duties. Thus, the Defendants were acting within the scope of their discretionary authority.

"Once the defendant establishes that []he was acting within h[is] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee v. Ferraro, 284 F. 3d 1188, 1194 (11th Cir. 2002). The plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred. See Hope v. Pelzer, 536 U.S. 730, 739 (2002). On this second prong of the analysis, "the plaintiff must show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." See Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994). The focus is not on the constitutional right alone but on the question whether the defendant's alleged action or inaction clearly violates that right. See, e.g., Smith v. City of Atlanta, 2011 U.S. Dist. LEXIS 109770, *14-15 (N.D. Ga., Sept. 27, 2011) (Thrash, J.) (referring to "a government agent's act" and "what defendant is doing"). In Smith, the Court stated "for a law to be clearly established in the qualified immunity context, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*. [ ] (emphasis in original) 2011 U.S. Dist. LEXIS 109770, *15 (quoting Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). In the Eleventh Circuit, only United States Supreme Court,

Eleventh Circuit, and Georgia Supreme Court cases may clearly establish rights under federal law. See Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc).

In accordance with the Eleventh Circuit decisions cited above, there does not appear to be any clearly established law in this jurisdiction for imposing liability for prison officials arising from a prison fire in which they conducted regular fire safety inspections, conducted a fire drill within a month of the fire, required officers to perform 30-minute fire watches and regular fire door checks, and knew that new fire alarm and sprinkler systems had been ordered to replace non-functioning ones. In addition, there does not appear to be any clearly established law in this jurisdiction for imposing liability for prison officials on a deliberate indifference to serious medical needs claim when an inmate incurred mild smoke inhalation, was checked by medical personnel multiple times and suffered no recognizable injury. Because no authority indicates that the challenged conduct violates clearly established law in the circumstances of this case, the Defendants are entitled to qualified immunity.

**IV.     CONCLUSION:**

For all the foregoing reasons, the Motion for Summary Judgment of Defendants Benton, Mack, Michael Mitchell and Awe should be granted.

This the 11th day of December, 2024.

/s/Andrew M. Magruder
ANDREW M. MAGRUDER
Special Assistant Attorney General
Georgia Bar Number 465710

2 George C. Wilson Court
Augusta, Georgia 30909
(706) 737-0771; amm@wmssd.net

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed **BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the CM/ECF parties of record.  I hereby certify that today I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Roy Chambers, Jr.
210 Farmington Avenue, Apt. 403
Hartford, CT 06105

This the 11th day of December, 2024.

s/Andrew M. Magruder
Georgia Bar No. 465710
Special Assistant Attorney General
2 George C. Wilson Court
Augusta, Georgia 30909
(706) 737-0771
amm@wmssd.net